973 So.2d 693 (2008)
Nora MILLER, et vir
v.
LAMMICO, et al.
No. 2007-C-1352.
Supreme Court of Louisiana.
January 16, 2008.
*695 Perret Doise, Nadia Marie de la Houssaye, Lafayette; The Nickel Law Firm, Milo Addison Nickel, Jr., Shreveport, for applicant.
Bergstedt Law Firm, John Gregory Bergstedt, Lake Charles; The Townsley Law Firm, Todd A. Townsley, Lake Charles; Raggio, Cappel, Chozen & Berniard, Richard B. Cappel, Lake Charles; Edmond Mazyck Thomas, for respondent.
KIMBALL, J.
We granted certiorari in this matter to consider whether this Court's decision in Hall v. Brookshire Brothers, Ltd., 02-2404 (La.6/27/03), 848 So.2d 559, which held that the percentages of comparative fault are allocated prior to imposing the Medical Malpractice Act damage cap set forth in *696 La. R.S. 40:1299.42(B)(1), is limited to those circumstances in which the plaintiff is comparatively at fault. For the following reasons, we find the Court of Appeal, Third Circuit's ruling, that Hall v. Brookshire Brothers, Ltd. is inapplicable when there is no comparative fault on behalf of plaintiff, to be erroneous. We further find that the Court of Appeal correctly affirmed the damages awarded by the jury. Accordingly, the Court of Appeal's decision is reversed in part, affirmed in part, and the trial court's judgment is reinstated.

FACTS AND PROCEDURAL HISTORY
Plaintiff, Nora Miller, became pregnant in 1997 at the age of 39 after several years of trying unsuccessfully, which included the assistance of various medical procedures. On December 31, 1997, Mrs. Miller delivered a healthy baby boy by caesarian section at Columbia Women and Children's Hospital in Lake Charles, Louisiana. The caesarian section was performed by her obstetrician/gynecologist ("OB-GYN"), Dr. Johnny Biddle. On the fourth day following the surgery, January 4, 1998, Mrs. Miller began to suffer abdominal pain and developed a moderate fever. Dr. Biddle placed Mrs. Miller on antibiotics and she was instructed to stop breast feeding her baby. Between January 4 and January 14, 1998, Mrs. Miller continued to suffer abdominal pain. The trial testimony of both Mr. and Mrs. Miller indicated that during this time Mrs. Miller was unable to tolerate the intensity of her pain, which she rated as a nine out of ten. Despite her fever and pain, as well as a pelvic CT scan that indicated a possible infection, Dr. Biddle did not conduct a pelvic exam. Dr. Biddle discharged Mrs. Miller from Columbia Women and Children's Hospital on January 14, 1998. According to the Millers' testimony adduced at trial, Mrs. Miller's fever and pain remained unexplained and unresolved.
Following her discharge from the hospital, Mrs. Miller's condition continued to worsen, the fever and pain persisted, and she had difficulty walking. As a result, Mr. Miller transported Mrs. Miller to St. Patrick Hospital in Lake Charles, Louisiana, where she was admitted for treatment on January 17, 1998. Dr. Biddle was again her treating physician during this hospital stay and ordered another CT scan of Mrs. Miller's abdomen and pelvis, as well as a gallium scan.[1] Pursuant to Dr. Biddle's order, Dr. Robert Neal Brown performed the CT scan on January 18, 1997. In his report, Dr. Brown described some abnormalities, but made no conclusions or recommendations to Dr. Biddle.
Dr. Charles J. Brdlik performed the gallium scan between January 20, 1997, and January 23, 1997. He reported the findings of the scan to be normal and showing no signs of infection, but later admitted at trial that this report was incorrect. On January 21, 1998, Dr. Biddle again discharged Mrs. Miller from the hospital, despite her continued pain and fever.
Following Mrs. Miller's second discharge from the hospital (this discharge being from St. Patrick Hospital), her condition continued to deteriorate as she remained at home in bed with pain and fever. Mr. Miller, concerned about his wife's health, brought her to see Dr. *697 Randall Wagman at the Westlake Medical Clinic in Westlake, Louisiana, in order to obtain a second opinion. After a cursory physical examination, Dr. Wagman concluded that Mrs. Miller likely had a pelvic abscess. During that visit, Dr. Wagman ordered radiological scans which revealed a massively infected pelvis.
Mrs. Miller was subsequently admitted to West Calcasieu-Cameron Hospital in Sulphur, Louisiana under the care of Dr. Ben Darby. An emergency Dilatation and Curettage ("D & C")[2] was performed on January 31, 1998, by Dr. McAlpine. Due to the damaged and necrotic nature of her tissue, Mrs. Miller bled severely during the procedure. To assist in controlling Mrs. Miller's bleeding, a laparotomy was performed wherein Mrs. Miller's uterus was removed. After over thirty days of infection, according to the plaintiff's expert, Mrs. Miller's uterus was distorted and necrotic to the point that it broke apart as it was removed from her body. Moreover, the abscess surrounding the uterus had adhered to the walls of Mrs. Miller's bowels, which required careful separation to prevent further damage to the bowels. Following Mrs. Miller's surgery, Dr. Darby informed the Millers that, without treatment, Mrs. Miller was three to seven days from death.
On July 6, 1998, the Millers timely filed a claim with the Medical Review Panel. The Medical Review Panel met on July 2, 2001, and rendered its opinion on July 5, 2001, unanimously concluding that the evidence did not support a finding that Dr. Johnny Biddle and Dr. Robert Neal Brown failed to comply with the appropriate standards of care. The panel further found that, although Dr. Charles Brdlik failed to comply with the appropriate standard of care, his conduct was not a contributing factor of the plaintiffs damages. The Medical Review Panel's Notice of Opinion was mailed to the parties on July 9, 2001.
On October 4, 2001, the Millers filed a Petition for Damages against Dr. Biddle, Dr. Brdlik, Dr. Brown, and their respective insurers in the Fourteenth Judicial District Court, Parish of Calcascieu. Dr. Biddle and Louisiana Medical Mutual Insurance Company filed a Motion for Summary Judgment on November 4, 2002, asserting that no genuine issue of fact existed as to any basis of liability with respect to Dr. Biddle. On March 19, 2003, the trial court ordered a Rule to Show Cause and set the hearing on the Rule for May 9, 2003. This hearing was continued on May 9, 2003.[3]
Dr. Biddle subsequently admitted liability and executed a settlement with the Millers in the amount of $100,000, which is the maximum amount of liability exposure pursuant to. La. R.S. 40:1299.42(B)(2).[4] Following Dr. Biddle's admission of liability and settlement with the Millers, a "Judgment Approving Settlement of Medical Malpractice Claim" was signed, pursuant to La. R.S. 40:1299.44(C), on March 15, *698 2005.[5] The order dismissing Dr. Biddle was signed by the trial court on May 10, 2005. As a result, under La. R.S. 40:1299.44, et seq., the Patients' Compensation Fund (PCF) became liable for any judgment against Dr. Biddle irk excess of $100,000 (up to the $500,000 Medical Malpractice Act cap provided for in La. R.S. 40:1299.42(B)(1)[6]).
Trial was held in this matter from March 28, 2005 to March 31, 2005.[7] During the course of the trial, Dr. Brdlik admitted to committing negligence in the reading of the gallium scan and a directed verdict was entered against him, in favor of the plaintiffs, on that issue on March 31, 2005. Consequently, the sole issue for the jury to decide pertaining to Dr. Brdlik's liability was whether his breach of the standard of care caused damage to the plaintiff. After hearing the facts of this case and the testimony of experts from both sides, the jury returned a verdict in favor of the Millers on March 31, 2005, apportioning eighty percent fault to Dr. Biddle, ten percent fault to Dr. Brdlik, and ten percent fault to Dr. Brown. Monetary damages in excess of $866,000 were awarded, then reduced to $566,400.05 (including past and future medical expenses) by the trial court in compliance with the damages cap imposed by the Louisiana Medical Malpractice Act.[8]
Following the return of the jury's verdict, but prior to entry of judgment, a dispute arose as to the proper method of applying the comparative fault percentages to the jury awards. The district court conducted a hearing on the issue on July 20, 2005, and, applying this Court's reasoning in Hall v. Brookshire Brothers, Ltd, 02-2404 (La.6/27/03), 848 So.2d 559, ordered the judgment to be constructed in such a manner that Dr. Brdlik and Dr. Brown were each liable for ten percent of the judgment prior to reduction to the statutory damages cap. Judgment was rendered on July 20, 2005, against Dr. Brdlik and Dr. Brown, each in the amount of $86,640. The PCF, after a $100,000 credit for the amount paid in settlement by Dr. Biddle, was, therefore, liable for $271,840.04. Although the PCF subsequently filed a Motion for JNOV, Motion for New Trial, and Motion for Additur on July 26, 2005, the trial court denied all of the PCF's motions on July 13, 2006,
Dr. Brdlik, Dr. Brown (hereinafter sometimes referred to as "the doctors"), their insurer (St. Paul Fire & Marine Insurance Company), and the PCF appealed the trial court's judgment to the Court of Appeal, Third Circuit. On appeal, both *699 the PCF and the doctors asserted that the jury abused its discretion in the amount of damages awarded.[9] Additionally, Dr. Brdlik and Dr. Brown asserted, on appeal, that: (1) the jury erred in finding Dr. BrdIlk's admitted breach of the standard of care caused harm to the plaintiffs; (2) the jury erred in finding that Dr. Brown breached the standard of care and that his breach caused harm to the plaintiffs; (3) the jury erred in the percentage of fault apportioned to each defendant; and (4) the trial court erred in approving a form of judgment resulting in monetary awards against Dr. Brdlik and Dr. Brown disproportionate (in relation to the amount of the post-cap judgment) to the ten percent fault allocated to each of them.
Based on a review of the particular facts of this case and the specific injuries suffered by the Millers, the Court of Appeal found that the jury did not abuse its great discretion in awarding damages. Miller v. Lammico, et al., 07-120, pp. 7-9 (La.App. 3 Cir. 5/30/07), 958 So.2d 775, 781-782. Accordingly, it upheld the damages awarded to the Millers.
The Court of Appeal further found the first three assignments of error asserted by the doctors to be without merit. In affirming the trial court's judgment, the Court of Appeal specifically found: (1) the jury did not err in concluding that Dr. Brdlik's admitted breach of the standard of care in improperly reading the gallium scan caused Mrs. Miller's harm because, absent Dr. Brdlik's breach, the surgery ultimately performed would have occurred earlier and would have been beneficial for Mrs. Miller; even if it still would have required removal of her uterus; (2) the jury did not err in finding Dr. Brown breached the standard of care and that his breach caused Mrs. Miller harm, because a reasonable factual basis existed for the jury's determination; and (3) the record established a reasonable factual basis for the jury's finding that Dr. Brdlik and Dr. Brown were each ten percent at fault, and thus, the court found no manifest error in that decision.
In their final assignment of error, Dr. Brdlik and Dr. Brown claimed that the trial court erred in approving a judgment in/which the ten percent fault they were each assessed was applied to the damages awarded prior to reduction to the statutory cap, thus rendering monetary awards against them disproportionate to their assigned fault. Miller, 07-120, p. 9, 958 So.2d at 782. Finding merit in this assignment of error, the Court of Appeal reversed the trial court's allocation of fault based on the pre-cap damage award in the amount of $866,400.05, and applied the percentages of fault after imposition of the Medical Malpractice Act damages cap. Id., p. 11, at 783. To support its ruling, the court reasoned that the instant case is distinguishable from Hall v. Brookshire Brothers, Ltd., 02-2404 (La.6/27/03), 848 So.2d 559, because the jury in this matter assigned no fault to the Millers. The court below stated that there was "no risk of double reduction and the ordinary rules of comparative fault should apply among the negligent defendants." Miller, 07-120, p. 10, 958 So.2d at 783. Accordingly, the Court of Appeal amended the judgment from the trial court as to the amount of damages owed by each defendant and rendered judgment against Dr. Brdlik in the amount of $56,640.01, against Dr. Brown in *700 the amount of $56,640.01, and against the PCF in the amount of $353,120.03. Id., p. 11, at 783. Under the Court of Appeal's interpretation the rule set forth in Hall v. Brookshire Bros., Ltd., 02-2404, 848 So.2d 559, that comparative fault is allocated to the damages award prior to imposition of the statutory cap, would be limited to those instances in which the plaintiff is comparatively at fault.
The PCF timely filed the instant writ application with this Court, asserting that the Court of Appeal's decision conflicts with our decision in Hall v. Brookshire Brothers, Ltd., 02-2404, 848 So.2d 559, because it calculated the liabilities of Dr. Brdlik and Dr. Brown using the amount recoverable after imposition of the Medical Malpractice Act damages cap, rather than the total damages awarded by the jury before the damages cap. Additionally, the PCF asserted, both of the lower courts erred in upholding the jury's damage award because it alleges the award is excessive and in conflict with previous cases involving similar injuries.
In opposition, the doctors maintain that Hall is factually distinguishable and should not be controlling in this instance. Specifically, the doctors argue that the rule set forth in Hall applies to allocation of comparative fault when the plaintiff bears some portion of the fault and, because the plaintiffs in the instant case are not comparatively at fault, the Hall rule is inapplicable. Finally, also in opposition, the plaintiffs contend that the jury's damages award was within its sound discretion.
We granted certiorari to review the decision of the Court of Appeal, Third Circuit in this matter and more specifically to determine whether this Court's decision in Hall v. Brookshire Brothers, Ltd., 02-2404, 848 So.2d 559, is limited to those circumstances in which the plaintiff is comparatively at fault. For the reasons that follow, we find the rule set forth in Hall, that the comparative fault percentages are allocated prior to imposition of the Medical Malpractice Act damages cap, is not limited to only those circumstances in which the plaintiff is comparatively at fault, but applies regardless of whether the plaintiff is assigned any portion of fault.

DISCUSSION
The general rule of comparative fault requires courts to calculate damages in such a manner that each tortfeasor pays only for that portion of the damage he has caused. La. Civ.Code art. 2323; Dumas v. State ex rel. Dep't of Culture, Recreation & Tourism, 02-0563, pp. 11-15 (La.10/15/02), 828 So.2d 530, 537-38. This Court, in Hall v. Brookshire Bros., Ltd., 02-2404 (La.6/27/03), 848 So.2d 559, held that, in a case covered by the Medical Malpractice Act, comparative fault is allocated prior to application of the damages cap imposed by La. R.S. 40:1299.42(B)(1).[10]Hall involved a plaintiff comparatively at fault and this. Court found that fault is apportioned based on the total judgment awarded prior to imposition of the statutory damages cap, and not from the reduced amount recoverable under the Medical Malpractice Act. 02-2404, p. 23, 848 So.2d 559, 573. The issue before this Court in the instant matter involves whether or not the rule set forth in Hall extends to those instances in which the Plaintiff is not comparatively at fault.
Additionally, in its writ application and brief to this Court, the PCF argued that the damages awarded by the jury and upheld by the lower courts are exorbitant and conflict with customary awards found *701 in Louisiana jurisprudence for this type of injury.

Apportionment of Fault
The jury's verdict in this case reflects the following awards: $250,000 for physical pain and suffering; $100,000 for loss of enjoyment of life; $250,000 for loss of uterus; $100,000 for mental pain and suffering; and $56,400.05 for past medical expenses. Additionally, Mr. Miller was awarded $100,000 for loss of consortium. The jury determined that Mrs. Miller is in need of future medical care and assessed the cost of that care at $10,000.[11] As mentioned previously, following the return of the jury's verdict, but prior to entry of judgment, a dispute arose as to how to allocate the fault percentages to the jury awards. The district court conducted a hearing on the issue and, applying this Court's reasoning in Hall v. Brookshire Brothers, Ltd.; 02-2404, 848 So.2d 559, the trial court calculated each party's liability as follows:

 Dr. Biddle Settlement: $100,000.00
 Dr. Brdlik Liability: $ 86,640.00
 Dr. Brown Liability: $ 86,640.00
 PCF Liability $271,840.04

First, the trial court calculated the damages owed by Dr. Biddle, Dr. Brdlik, and Dr. Brown by applying the percentage of fault allocated to each to the total amount awarded by the jury for physical pain and suffering, loss of enjoyment of life, loss of uterus, mental pain and suffering, past medical expenses, and loss of consortium. The PCF and St. Paul Fire and Marine Insurance Company were found liable for $556,400.05, subject to a credit in the amount of $100,000 reflecting plaintiffs settlement with Dr. Biddle. Dr. Brdlik and Dr. Brown were each found liable for $86,640, however, because the amount of damages allocated to them did not exceed $100,009, they were responsible for the full amount Of the judgment rendered against them.[12]
The primary disagreement between the PCF and the doctors involves whether comparative fault is apportioned before or after the statutory Medical Malpractice Act damages cap is imposed when the plaintiff is not comparatively at fault. The PCF asserts that the Court of Appeal, Third Circuit erred when it reversed the trial court's judgment and held that the ten percent liabilities of Dr. Brdlik and Dr. Brown should have been calculated using the post-cap recoverable amount of $566,400.05, rather than using the pre-cap damages in the amount of $866,400.05.
The PCF argues that this Court, in Hall v. Brookshire Brothers, Ltd., 02-2404, 848 So.2d 559, held the apportionment of liability under Louisiana's scheme of comparative fault requires allocation of fault based on the total damages recoverable, not the amount recoverable under La. R.S. 40:1299.42(B)(1) of the Medical Malpractice Act. Thus, the PCF asserts that the trial court properly apportioned the percentages, of fault based on the damages recoverable in the amount of $866,400.05.
Conversely, the doctors and their insurer state that the amount of their ten percent liabilities should have been calculated using the amount recoverable, after application of the $500,000 damages cap and not using the total damages recoverable in the amount of $866,400.05 awarded by the jury. The doctors further assert that Hall v. Brookshire Brothers, Ltd., 02-2404, 848 So.2d 559, is not applicable' in the instant case as it is factually distinguishable. Specifically, the doctors argue that the rule set forth in Hall applies only in *702 those cases where some percentage of fault was assigned to the plaintiff. Moreover, the doctors maintain that the issue before this Court in Hall was determining "the proper method for calculating the reductions to be made because of a comparatively-at-fault plaintiff . . ." (Brief of Appellee at 5). The doctors assert that the primary reason for this Court's adoption of the formula in Hall was because the plaintiff was comparatively at fault, and in doing so, the Court sought to prevent double reduction of the plaintiff's recovery. Logically, the doctors argue, if the reason for adopting the rule set forth in Hall was to avoid double reduction of the plaintiff's recovery and the plaintiff in the instant matter is not at fault, then there is no risk of double reduction and the rule from Hall is inapplicable.
Second, the doctors argue that application of the rule set forth in Hall v. Brookshire Brothers, Ltd., 02-2404, 848 So.2d 559, to the instant case would result in an "unreasonable and manifestly unjust" windfall to the benefit of the PCF, making it responsible for only 61% of the host-cap damage award, despite an 80% fault assessment against Dr. Biddle, for which the PCF is liable in excess of the settlement agreement pursuant to La. R.S. 40:1299.44(C)(5).[13] Moreover, the doctors maintain, they should not be required to pay a share of the total $566,640 post-cap damages award in excess of the ten percent fault assigned to each.
Finally, the doctors assert that the proper method for calculating the damages allocated to parties found to be comparatively at fault has previously been considered by other courts and this Court. Specifically, the doctors cite Bullock v. Graham, 96-0711 (La.11/1/96), 681 So.2d 1248, abrogated on other grounds by Benoit v. Allstate Ins. Co., 00-0424 (La.11/28/00), 773 So.2d 702 and Stevens v. Winn-Dixie of Louisiana, 95-0435 (La. App. 1 Cir. 11/9/95), 664 So.2d 1207. The Bullock and Stevens cases involve voluntary stipulations made by plaintiffs to avoid a jury trial, and are decisions in which the courts found that the damages awarded should first be reduced to the stipulated amount. See Bullock, 96-0711, p. 7, 681 So.2d at 1252; Stevens, 95-0435, p. 8, 664 So.2d at 1213. After the damages award is reduced, the comparative fault percentages should be applied to the reduced amount. Bullock, 96-0711, p. 7, 681 So.2d at 1252; Stevens, 95-0435, p. 8, 664 So.2d at 1213. Therefore, the doctors argue, the Court of Appeal was correct in reversing the trial court's judgment and amending the judgment to reflect allocation of comparative fault after the damages cap statutorily imposed by the Medical Malpractice Act.
To resolve this issue, we must therefore determine whether this Court's decision in Hall v. Brookshire Brothers, Ltd., 02-2404, 848 So.2d 559, is limited to those instances in which the plaintiff is found to be comparatively at fault. As such, it is first necessary for us to examine our decision in Hall.
In Hall v. Brookshire Brothers, Ltd., 02-2404, 848 So.2d 559, this Court held that the proper method for applying the comparative fault scheme is to apply the jury's comparative fault finding prior to reducing the damages award under La. R.S. 40:1299.42(B)(1).[14] We based our *703 holding on three primary grounds, finding that comparative fault percentages should be allocated prior to application of the statutory damages cap under the Medical Malpractice Act because: (1) the use of different language in the comparative fault article and statutory damages cap provision dictates this result; (2) the comparative fault and Medical Malpractice Act damages cap provisions are in derogation of established rights and must be strictly construed; and (3) a contrary rule would lead to absurd consequences.
In Hall v. Brookshire Brothers, Ltd., 02-2404, p. 17, 848 So.2d 559, 570, this Court first determined that La. Civ.Code art. 2323 was silent with respect to whether the percentage reduction for comparative fault is to be applied before or after imposition of the statutory damages cap. The Court then distinguished the language of the Civil Code and the Medical Malpractice Act, specifically addressing the term "damages recoverable," found in La. Civ. Code art. 2323(A) (the comparative fault provision) and the term "amount recoverable" used in La. R.S. 401299.42(B)(1) of the Medical Malpractice Act (the Medical Malpractice Act damages cap). Id., pp. 18-19, at 570-71.
La. Civ.Code art. 2323(A) provides:
In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of La. R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
(Emphasis added).
Additionally, La. R.S. 40:1299.42(B)(1) provides:
The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in La. R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost.
(Emphasis added).
In Hall, we found that "Nile damages sustained by a medical malpractice victim are distinct from the amount that can be recovered for those damages." 02-2404, p. 18, 848 So.2d at 571(emphasis added). In so finding, we held that the proper application of La. Civ.Code article 2323 requires calculation of the damages owed and allocation of comparative fault before reduction of the damages award in accordance with the statutory damages cap set forth in La. R.S. 40:1299.42(B)(1). Id., p. 23, at 573. Reasoning that the rules of statutory interpretation mandate that the court consider the legislature's choice of language as deliberate,[15] we found the legislature's decision to use "damages recoverable" in *704 article 2323, instead of "amount recoverable" was deliberate. Id., p. 19, at 571. Had the legislature intended to limit allocation of comparative fault in cases covered by the Medical Malpractice Act to the "amount recoverable," it could have used language identical to that set forth in La. R.S. 40:1299.42(B)(1) when it introduced the comparative fault scheme into La. Civ. Code art. 2323 in 1979, or when article 2323 was subsequently amended in 1996.[16]
This Court in Hall further based its holding on the principle that statutes in derogation of established rights should be strictly construed. Dumas v. State ex rel. Dep't of Culture, Recreation & Tourism, 02-0563, pp. 11-15 (La.10/15/02), 828 So.2d 530, 537-38. See also Spradlin v. Acadia, St. Landry Medical Foundation, 98-1977, p. 6 (La.2/29/00), 758 So.2d 116, 120; Conerly v. State, 97-0871, p. 3 (La.7/8/98), 714 So.2d 709, 710; Sewell v. Doctors Hosp., 600 So.2d 577, 578 (La.1992). Specifically, we found that the comparative fault and Medical Malpractice Act damages cap provisions are in derogation of a victim's established rights because they impede the ability of an injured party to obtain full recovery of his damages.[17]Hall v. Brookshire Brothers, Ltd., 02-2404, pp. 17-18, 848 So.2d 559, 570. As such, that principle requires allocation prior to imposing the damages cap because to allocate otherwise would enhance and amplify the reduction imposed upon the plaintiff. Id., p. 19, at 571.
*705 Finally, the Hall Court reasoned that application of comparative fault after the damages cap is imposed would lead to an absurd result. Id., p. 19, at 57L Specifically, the plaintiff in Hall would have been subject to a double reduction of the damages awarded. Id., p. 20, at 571. The first, reduction of damages occurs as a result of the damages cap pursuant to the Medical Malpractice Act. Following the first reduction, plaintiffs recovery would be further reduced by the percentage of fault allocated to him or her under the comparative fault scheme. This result, as we stated in Hall, would be absurd because it is "not supported by the language, purpose or intent of the comparative fault act." Id.
The Third Circuit in the instant matter viewed Hall v. Brookshire Brothers, Ltd., 02-2404, 848 So.2d 559, as applicable only when a plaintiffs fault creates a risk of double, reduction of his or her recovery. Similarly, the doctors argue that this case is factually distinguishable from Hall because the plaintiff in that case was found to be comparatively at fault. Both the Third Circuit and the doctors point out that, in contrast to the plaintiff in Hall, the Millers were not allocated any portion of the fault. In light of our examination of Hall, we now address whether it is determinative if the plaintiff is comparatively at fault, specifically for purposes of determining the appropriate formula for applying the comparative fault provision set forth in La. Civ.Code art. 2323.
Although avoidance of double reduction of the plaintiffs damage was a factor in our decision in Hall v. Brookshire Brothers, Ltd., 02-2404, 848 So.2d 559, it was not the'primary nor the sole reason for our. conclusion. In granting certiorari in Hall, this Court stated that it sought to determine "the proper method for calculating the percentage reduction for comparative fault when the award of damages in a malpractice action exceeds the statutory cap." 02-2404, p. 14, 848 So.2d at 568. The scope of the issue framed by this Court in Hall was not so narrow to exclude application of the rule set forth in that case in those instances in which the plaintiff bears no portion of the fault. To the contrary, the first reason for our holding in Hall was based on our statutory interpretation of the language utilized by the legislature in La. Civ.Code art. 2323. Thus, the doctors' argument that the only reason for the rule set forth in Hall was because the plaintiff was comparatively at fault is without merit.
For the reasons discussed herein, we do not find it necessary, to deviate from our previous holding in Hall v. Brookshire Brothers, Ltd., 02-2404, 848 So.2d 559, as it is correct and supplies the foundation for our decision in this matter. Specifically, we find our decision in Hall, holding that comparative fault is allocated prior to imposition of the statutory damages cap, is not limited to those instances in which the plaintiff is comparatively at fault.
It is well-settled that the comparative fault regime applies to liability based on medical malpractice. Dumas v. State ex rel. Dep't of Culture, Recreation & Tourism, 02-0563, p. 12 (La.10/15/02), 828 So.2d 530, 537 ("The comparative fault article, La. C.C. art. 2323, makes no exceptions for liability based on medical malpractice; on the contrary, it clearly applies to any claim asserted under any theory of liability, regardless of the basis of liability."). It is therefore necessary for us to determine the appropriate method for allocation of comparative fault in action based in medical malpractice.
The starting point for the interpretation of any statute is "the language of the statute itself." Touchard v. Williams, 617 So.2d 885, 888 (La.1993), superseded on other grounds by statute in Dumas v. *706 State ex rel. Dep't of Culture, Recreation & Tourism, 02-0563 (La.10/15/02), 828 So.2d 530; Theriot v. Midland Risk Ins. Co., 95-2895, p. 3 (La.5/20/97), 694 So.2d 184, 186. In Hall, this Court determined that the language of article 2323 is silent as to whether comparative fault is allocated to the post-cap or pre-cap damages award in an action covered by the Medical Malpractice Act. 02-2404, p. 17, 848 So.2d 559 at 570. Because article 2323 is silent, it is necessary to explore the article's purpose. "It is a familiar rule of statutory construction that the general purpose and object of the law must be kept in mind and the statute given such fair and reasonable interpretation as will effect the purpose and object for which it was enacted." J.M. Brown Const. Co. v. D & M Mech. Contractors, Inc., 275 So.2d 401, 404 (La.1972). Thus, we now evaluate the purpose of the comparative fault provisions.
The fundamental purpose of Louisiana's comparative fault scheme is to ensure that each tortfeasor is responsible only`for that portion of the damage he has caused. Dumas, 02-0563, p. 14, 828 So.2d 530, 538. Therefore, each tortfeasor is responsible for the damage he has caused, regardless of any potential for reduction under the Medical Malpractice Act. The percentage of the damages assigned to the tortfeasor by the fact finder is that specific portion of the total amount of damages that the fact finder determines the tortfeasor has caused, without regard to the statutory cap. Only when a Qualified Health Care Provider[18] causes damage in excess of $500,000 does the Medical Malpractice Act damages cap apply. La. R.S. 40:1299.42(B)(1). Thus, in accordance with the purpose of the comparative fault scheme, a doctor who has committed malpractice is responsible for the damages he causes, and only after that amount exceeds the statutory damages cap will the victim's recovery be reduced as a result of the Medical Malpractice damages cap found in La. R.S. 40:1299.42(B)(1).
*707 Moreover, when comparative fault percentages are allocated to the verdict prior to application of the damages cap set forth in La. R.S. 40:1299.42(B)(1), there is no risk that a tortfeasor will be liable for damages in excess of those which the fact finder has determined the tortfeasor caused. Cf. Hall v. Brookshire Brothers, Ltd., 02-2404, p. 21, 848 So.2d 559, 572 (pointing out that allocation of comparative fault prior to imposition of the Medical Malpractice Act damages cap creates no risk that the plaintiff will recover damages the jury found were caused by him or her). Although Dr. Brdlik and Dr. Brown are liable for an amount that exceeds ten percent of the amount recoverable by the Millers after the damages cap is imposed, the doctors are not liable for an amount in excess of ten percent of the total damages the jury determined they caused. For these reasons, the purpose of the comparative fault scheme is satisfied when the comparative fault percentages are allocated prior to imposition of the Medical Malpractice Act damages cap set forth in La. R.S. 40:1299.42(B)(1).
The doctors in the instant matter raise the same argument previously posited by the PCF in Hall v. Brookshire Brothers, Ltd., 02-2404, 848 So.2d 559. Specifically, the defendants maintain that in both Bullock v. Graham, 96-0711 (La.11/1/96), 681 So.2d 1248, abrogated on other grounds by Benoit v. Allstate Ins. Co., 00-0424 (La.11/28/00), 773 So.2d 702 and Stevens v. Winn-Dixie of Louisiana 95-0435 (La. App. 1 Cir. 11/9/95), 664 So.2d 1207, the damages awarded to the plaintiff were reduced to the stipulated amount prior to allocating the comparative fault percentages. Similarly, the doctors argue, any reduction required as a result of the Medical Malpractice Act damages cap should occur prior to allocation of the comparative fault percentages attributable to each of them.
In Bullock, 96-0711, p. 2, 681 So.2d at 1249 defendants requested a trial by jury in their answer to the plaintiff's petition. Plaintiff, however, filed an amending petition alleging that the "amount in controversy" did not exceed the $20,000 threshold for trial by jury (the threshold at that time was $20,000, however, it is now $50,000 by virtue of Acts 1993, No. 661).[19]Id. The defendants answered the amended petition by making the same stipulation. Id. In her original petition, the plaintiff in Bullock alleged that she had zero fault. Id., p. 5, at 1251. Therefore, the plaintiff alleged that the most she expected to recover if she was not found at fault was $20,000. A bench trial was held and the court awarded damages in the amount of $28,288, which was subsequently reduced to $16,973 based upon a finding that the plaintiff was 40% at fault. Id., p. 2, at 1249. The First Circuit reversed, reducing plaintiffs total recovery to $12,000 and holding that the trial court should have first reduced the $28,288 total damages award to the jurisdictional limit and then further reduced the $20,000 by plaintiff s 40% comparative fault. Id., pp. 2-3, at 1249-50. A majority of this Court affirmed the First Circuit's decision. Id., p. 7, at 1252.
In Hall v. Brookshire Brothers, Ltd., 02-2404, p. 22 (La.6/27/03), 848 So.2d 559, 573 this Court distinguished Bullock, stating that the circumstances presented in that case were factually distinguishable from those presented in Hall. As mentioned, in a deliberate effort to prevent jury trial, the plaintiff in Bullock voluntarily *708 stipulated that the most she could expect to recover, if found free from fault, was $20,000. Hall, 02-2404, p. 22, 848 So.2d 559 at 573. The recovery of her total damages was "limited by her own stipulation as to the value of those damages; not by operation of law." Id. We further noted that the defendant in Bullock was deprived of its right to a jury trial by the plaintiff's stipulation and could not have been further penalized by having that stipulation disregarded when the total damage award exceeded the amount of the stipulation, Id. The stipulation would be disregarded because, for example, an award of $20,000 to a plaintiff found to be fifty percent at fault disregards the plaintiffs stipulation that total damages would not exceed $20,000. In Hall, this Court focused on the voluntary action of the plaintiff to limit her recovery, in contrast to a statutorily imposed limitation, such as the Medical Malpractice Act damages cap set forth in La. R.S. 40:1299.42(B)(1). Id. The Medical Malpractice Act damages cap is distinguishable from a plaintiffs stipulation to avoid a jury. trial. In general, neither of the cases cited by the doctors in this matter involved a statutorily imposed and non-voluntary reduction of a plaintiffs damages. Additionally, the facts of Stevens and Bullock are not consistent with facts of the instant case because both cases involved plaintiff fault, the sole factor which the doctors argue distinguishes Hall from the instant case.
In the cases relied on by the doctors, the plaintiff voluntarily chose to limit the amount of damages recoverable to avoid a jury trial. As we noted in Hall v. Brookshire Brothers, Ltd., 02-2404, p. 22, 848 So.2d 559, 573, the plaintiff in Bullock limited recovery of her total damages by means of a voluntary stipulation and not by operation of law. This distinction is significant because it was the plaintiffs choice to limit the amount of damages she could recover, as opposed to a statutorily imposed limitation, with which a plaintiff is required to comply.
Moreover, a plaintiffs stipulation to avoid a jury trial, like the plaintiffs stipulation in Bullock, is analogous to those circumstances in which a plaintiffs petition alleges that the amount in dispute does not exceed the jurisdictional limits of a court. Bullock v. Graham, 96-0711 (La.11/1/96), 681 So.2d 1248, abrogated on other grounds by Benoit v. Allstate Ins. Co., 00-0424 (La.11/28/00); 773 So.2d 702. Though applicable to the amount in dispute for jurisdictional purposes, we find the language of La. C.C.P. art. 5 instructive with respect to stipulations entered into to avoid a jury trial.[20] La. C.C.P. article 5 provides that the plaintiff remits that portion of the claim not prayed for.[21] If a plaintiff alleges that the amount in *709 dispute does not exceed the jurisdictional limit, the court is without jurisdiction to render a judgment in excess of its jurisdictional limit.[22] Similarly, a plaintiff's stipulation has the effect of a judicial admission or confession and binds all parties and the court. R.J. D'Hemecourt Petroleum, Inc. v. McNamara, 444 So.2d 600, 601 (La.1983). Accordingly, it follows that any damages in excess of the stipulated amount are remitted by the plaintiff's voluntary decision to enter into the stipulation, and thus in no instance could damages exceed the stipulated amount. This is in contrast with those cases involving comparative fault and the Medical Malpractice Act damages cap. Although the verdict may exceed the statutory damages cap, the Medical Malpractice Act, rather than a voluntary stipulation, requires reduction in order to comply with the cap.
The Court of Appeal, Third Circuit concluded that an equal application of Hall v. Brookshire Brothers, Ltd., 02-2404, 848 So.2d 559, to a non-plaintiff defendant creates a "windfall" and additional benefit for the PCF. Miller v. LAMMICO, et al, 07-120, p. 10 (La.App. 3 Cir. 5/30/07), 958 So.2d 775, 783. The doctors also argue that application of the rule set forth in Hall results in a windfall to the benefit of the PCF. The situation presented in Hall, however, illustrates a contrary outcome. In Hall, the jury awarded Mrs. Hall $1,646,834 for physical and mental pain and suffering, loss of enjoyment of life (past and future), permanent or partial physical disability, loss of earning capacity, as well as $35,251.43 for past medical expenses. 02-2404, p. 15, 848 So.2d at 568. Mr. Hall was awarded $200,000 for loss of consortium. Id., p. 15, at 569. Additionally, the jury found Mrs. Hall in need of future medical care. Id., p. 15, at 568. The trial court first reduced the total amounts awarded, exclusive of past medical expenses, by the 15% fault allocated to Mrs. Hall and a third-party pharmacist. Id., p. 15, at 569. Because this amount exceeded the statutory damages cap, the trial court reduced the award to $400,000 (after deducting $100,000 for the settlement with one of the defendant-healthcare providers), in compliance with the Medical Malpractice Act damages cap pursuant to La. R.S. 40:1299.42(B)(1).[23]Id., p. 15, at 568.
In Hall, we held that comparative fault is allocated prior to application of the Medical Malpractice Act damages cap and affirmed the judgment against the PCF in the amount of $429,963.72.[24]Id., p. 23, at 573. Had the contrary rule applied, the rule the doctors argue should apply in the instant matter, the PCF would have only been required to pay 85% of the $400,000 judgment (in addition to 85% of the past medical expenses), thereby significantly reducing the liability of the PCF. As the facts of Hall illustrate, the rule requiring allocation of comparative fault prior to application of the Medical Malpractice damages cap, does not consistently result in a *710 benefit to the PCF, thus the doctors assertion is without merit.
Conversely, the rule promoted by the doctors, which provides for application of the damages cap prior to allocation of comparative fault in those instances where the plaintiff is not comparatively at fault, may sometimes create an additional benefit for Qualified Health Care Providers (QHCP). Specifically, the advantages the QHCP's receive as a result of the comparative fault provisions are compounded with the Medical Malpractice Act damages cap to substantially reduce the healthcare provider's liability. This additional benefit does not serve the purposes of either La. Civ.Code art. 2323 or La. R.S. 40:1299.42(B)(1). The purpose of these provision can be considered together because the rules of comparative fault apply to liability based on the theory of medical malpractice. Dumas v. State ex rel. Dep't of Culture, Recreation & Tourism, 02-0563, p. 12 (La.10/15/02), 828 So.2d 530, 537.
Regarding the purpose of the Medical Malpractice Act, this Court has previously recognized that the Medical Malpractice Act, in general, seeks to further two competing goals. First, it seeks to ensure the availability of safe and affordable health care services to the public, and second, to simultaneously limit the potentially significant liability exposure of health care providers. La. R.S. 40:1299.41 et seq.; Everett v. Goldman, 359 So.2d 1256, 1261-62 (La.1978); Hutchinson v. Patel, 93-2156, pp. 3-4 (La.5/23/94), 637 So.2d 415, 419. Specifically, the Act supplies Qualified Health Care Providers two substantial benefits in malpractice actions brought against them. First, under La. R.S. 40:1299.42(B)(2), the Act limits the amount of damages a plaintiff can recover from a Qualified Health Care Provider to $100,000. Second, pursuant to La. R.S. 40:1299.47(A)(1)(a),[25] the Act requires a claim first be reviewed by a medical review panel before a suit may be commenced. Hutchinson, 93-2156, pp. 3-4, 637 So.2d at 419.
Concerning the purpose of the comparative fault provisions, the comparative fault system was initially adopted to remedy the harshness of the contributory negligence rule by apportioning losses between a plaintiff and defendant when both are negligent, rather than barring all recovery by the plaintiff when the plaintiff is found at fault. Dumas, 02-0563, pp. 3-4, 828 So.2d at 533; Murray v. Ramada Inns, Inc., 521 So.2d 1123, 1132 (La.1988). Following the 1996 amendments to La. Civ. Code art. 2323, this Court has recognized that the fundamental purpose of Louisiana's comparative fault scheme is to ensure each tortfeasor is responsible only for that portion of the damage he has caused. Dumas, 02-0563, p. 14, 828 So.2d at 538.
There is no indication that the legislature, with the introduction of comparative fault into article 2323 in 1979, and the subsequent amendment of article 2323 in 1996, intended to bestow an additional benefit upon Qualified Health Care Providers. To the contrary, Qualified Health Care *711 Providers already receive the benefits intended by the legislature, the primary benefit being that the amount of their liability is limited to $100,000 pursuant to La. R.S. 40:1299.42(B)(2). Providing the possibility of an additional benefit does not conform with the purposes of either the Medical Malpractice Act or the comparative fault scheme.
For all of the foregoing reasons, we find that comparative fault is allocated prior to imposition of the Medical Malpractice Act damages cap, regardless of whether the plaintiff is comparatively at fault.

Excessive Damages
We now address whether the Court of Appeal, Third Circuit erred in affirming the jury's damage award. The PCF asserts that the damages awarded by the jury and upheld by the Court of Appeal are excessive and inconsistent with prior verdicts in cases involving similar injuries. Conversely, plaintiffs maintain that the jury's verdict on damages was within its sound discretion.
General damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty. Boswell v. Roy O. Martin Lumber Co., Inc., 363 So.2d 506, 507 (La.1978); Anderson v. Welding Testing Lab., Inc., 304 So.2d 351, 352 (La.1974). In the instant matter, general damages in the total amount of $800,000 were awarded by the jury to Mrs. Miller for physical pain and suffering, loss of enjoyment of life, loss of uterus, mental pain and suffering, and to Mr. Miller for loss of consortium.
An appellate court reviews a trial court's general damage award using the abuse of discretion standard. Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976). The trier of fact is afforded much discretion in independently assessing the facts and rendering an award because it is in the best position to evaluate witness credibility and see the evidence firsthand. Anderson v. New Orleans Pub. Serv., Inc., 583 So.2d 829, 834 (La.1991). An appellate court may disturb a damages award only after an articulated analysis of the facts discloses an abuse of discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993); Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993) (the fact finder's discretion in awarding general damages is vast and should rarely be disturbed); Reck v. Stevens. 373 So.2d 498, 501 (La.1979). To determine whether there has been an abuse of discretion by the fact finder, the reviewing court looks first to the facts and circumstances of the particular case. Theriot, 625 So.2d at 1340; Reck, 373 So.2d at 501. Only if a review of the facts reveals an abuse of discretion, is it appropriate for the appellate court to resort to a review of prior similar awards. Reck, 373 So.2d at 501; Anderson, 583 So.2d at 834; Youn, 623 So.2d at 1261. In a review of the facts, the test is whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. Theriot, 625 So.2d at 1340; Reck, 373 So.2d at 501. It is important to note, however, that prior awards are only a guide. Theriot, 625 So.2d at 1340.
The issue of whether the amount of damages awarded conflicts with similar awards only arises once it has been ascertained that the jury abused its discretion in determining the amount of damages awarded; therefore, we must first determine whether the Court of Appeal applied the proper standard of review. The Court of Appeal thoroughly considered the particular facts and circumstances of the injuries suffered by the plaintiffs in this matter, as well as how those injuries impacted the plaintiffs. Specifically, the Court of Appeal noted the extent and severity of *712 the damages sustained by Mrs. Miller, recognized the effect Mrs. Miller's injuries had on her relationship with her newborn baby and her husband, and observed the ramifications of Mrs. Miller's injuries to her impending retirement from the United States Navy. The Court of Appeal thoroughly reviewed and found adequate support for each item of damages. Based on its review, the Court of Appeal found that the jury did not abuse its great discretion in making its damage award. Miller v. LAMMICO, et al., 07-120, p. 9 (La.App. 3 Cir. 5/30/07), 958 So.2d 775, 781-82. We find that the articulated analysis employed by the Court of Appeal satisfies the applicable standard of review.
The Court of Appeal properly applied the relevant standard of review in this matter and, because it found the jury did not abuse its discretion in awarding damages to the plaintiffs, its decision did not require a comparison and review of prior awards for similar injuries. Accordingly, we find the Court of Appeal did not err in affirming the jury's damage award, nor did it err in failing to review prior similar awards.

DECREE
For all of the foregoing reasons, we find that our decision in Hall v. Brookshire Brothers, Ltd., 02-2404 (La.6/27/03), 848 So.2d 559, is not limited to those instances in which the plaintiff is comparatively at fault. We find that it is proper to apply comparative fault before reducing the award of damages under La. R.S. 40:1299.42(B)(1), regardless of whether the plaintiff is comparatively at fault. We further find that the Court of Appeal properly applied the standard of review in affirming the jury's damage award. Accordingly, we reverse that part of the Court of Appeal judgment amending the trial court's judgment to reflect a reduction of the damage award to the statutory cap prior to allocation of comparative fault, reinstate the trial court's judgment as to calculation of damages, and affirm that part of the Court of Appeal's judgment affirming the jury's damage award.
REVERSED IN PART, AFFIRMED IN PART.
VICTORY, J., concurs in the result.
NOTES
[1] A gallium scan, used to locate cancer cells or areas of inflammation, is specifically defined as a procedure to detect areas of the body where cells are dividing rapidly. A very small amount of radioactive gallium is injected into a vein and travels through the bloodstream. The gallium is taken up by rapidly dividing cells in the bones, tissues, and organs and is absorbed by a scanner, Rick. Daniels, Delmar's Guide to Laboratory and Diagnostic Tests, Section II (2002).
[2] "Dilatation and Curettage" is a procedure used to scrape away the lining of the uterus. The procedure may be utilized to diagnose and treat heavy bleeding from the womb as well as other uterine disorders. Black's Medical Dictionary, 201 (41st ed.2006).
[3] The record reflects that this hearing was continued and the date was not reset. There is no indication of how or if the court disposed of Dr. Biddle's Motion for Summary Judgment.
[4] La. R.S. 40:1299.42(B)(2) provides:

"A health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars plus interest thereon accruing after April 1, 1991, for all malpractice claims because of injuries to or death of any one patient."
[5] La. R.S. 40:1299.44(C) sets forth the procedure for settlements of liability with a health care provider's insurer when the claimant is demanding an amount from the PCF in excess of the settlement,
[6] La. R.S. 40:1299.42(B)(1) provides:

"The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in La. R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost."
[7] The record reflects apparent inconsistencies regarding the dates of trial in this matter. The trial court's Minute Entry indicates that this matter came on for trial March 28, 2005, and that the jury verdict was rendered on March 31, 2005. Moreover, the verdict sheet was dated and signed by the jury foreman on March 31, 2005. However, the judgment signed by the trial court states that this matter came on for trial on April 4, 2005 and the jury verdict was delivered to the Court on April 7, 2005.
[8] The Medical Malpractice Act damages cap is $500,000. La. R.S. 40:1299.42(B)(1). The amount in excess of $500,000 was awarded in this matter for future medical expenses, as the damages cap does not apply to future medical expenses. La. R.S. 40:1299.43(D).
[9] The PCF, in its sole assignment of error, asserted that the trial court abused its discretion by upholding an unreasonably excessive jury verdict. Due to the similarity in the assignments of error raised by the PCF and the doctors, the Court of Appeal addressed them together. Miller v. LAMMICO, et al., 07-120, p. 3 n. 1, (La.App. 3 Cir. 5/30/07), 958 So.2d 775, 779 n. 1.
[10] See supra, note 6 and accompanying text.
[11] As noted above, future medical expenses are not subject to the $500,000 damage cap. La. R.S. 40:1299.43(D).
[12] See supra, note 4 and accompanying text.
[13] When the fund is defending an action for excess damages after a plaintiff has settled with a healthcare provider, the PCF is in the nature of a statutory intervenor. Stuka v. Fleming, 561 So.2d 1371, 1374 (La.1990).
[14] See supra, note 6 and accompanying text.
[15] In Hall, this Court relied upon ABL Management, Inc. v. Board of Supervisors of Southern University, 00-0798, p. 6 (La.11/28/00), 773 So.2d 131, 135 ("It is presumed that every word, sentence or provision in the statute was intended to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were used. . . . [Further, title Legislature is presumed to have enacted each statute with deliberation and with full knowledge of all existing laws on the same subject."). See also Theriot v. Midland Risk Ins. Co., 95-2895, p. 4 (La.5/20/97), 694 So.2d 184, 186; City of New Orleans v. Bd. of Sup'rs., 216 La. 116, 43 So.2d 237, 547 (1949); State v. Shushan, 206 La. 415, 19 So.2d 185, 190 (1944).
[16] By Acts 1979, No. 431, effective August 1, 1980, the legislature introduced comparative fault into Louisiana law by amending La. Civ. Code art. 2323 to provide:

When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person Suffering the injury, death or loss. In 1996, the legislature again amended La.
Civ.Code art. 2323, by Acts 1996, 1st Ex.Sess., No. 3 as follows:
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of La. RS. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.
C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.
[17] Specifically, the Medical Malpractice Act's "limitations on liability of health care provider[s] constitutes special legislation in derogation of rights of tort victims and, as such, the Act's coverage should be strictly construed." Pendleton v. Barrett, 95-2066, p. 9 (La.5/31/96), 675 So.2d 720, 725 overruled on other grounds by Graham v. Willis-Knighton Medical Center, 97-0188 (La.9/9/97), 699 So.2d 365. See also Sewell v. Doctors Hosp., 600 So.2d 577, 578 (La.1992).
[18] La. R.S. 40:1299.42(A) provides:

To be qualified under the provisions of this Part, a health care provider shall: (1) Cause to be filed with the board proof of financial responsibility as provided by Subsection E of this Section. (2) Pay the surcharge assessed by this Part on all health care providers according to La. R.S. 40:1299.44.(3) For self-insureds, qualification shall be effective upon acceptance of proof of financial responsibility by and payment of the surcharge to the board. Qualification shall be effective for all others at the time the malpractice insurer accepts payment of the surcharge.
A healthcare provider is defined in La. R.S. 40:1299.41(A)(1) as:
[A] person, partnership, limited liability partnership, limited liability company, corporation, facility, or institution licensed or certified by this state to provide health care or professional services as a physician, hospital, nursing home, community blood center, tissue bank, dentist, registered or licensed practical nurse or certified nurse assistant, offshore health service provider, ambulance service under circumstances in which the provisions of La. R.S. 40:1299.39 are not applicable, certified registered nurse anesthetist, nurse midwife, licensed midwife, pharmacist, optometrist, podiatrist, chiropractor, physical therapist, occupational therapist, psychologist, social worker, licensed professional counselor, licensed perfusionist, or any nonprofit facility considered tax-exempt under Section 501(c)(3), Internal Revenue Code, pursuant to 26 U.S.C. 501(c)(3), for the diagnosis and treatment of cancer or cancer-related diseases, whether or not such a facility is required to be licensed by this state, or any professional corporation a health care provider is authorized to form under the provisions of Title 12 of the Louisiana Revised Statutes of 1950, or any partnership, limited liability partnership, limited liability company, management company, or corporation whose business is conducted principally by health care providers, or an officer, employee, partner, member, shareholder, or agent thereof acting in the course and scope of his employment.
[19] La. C.C.P. art. 1732(1) provides:

"A trial by jury shall not be available in [a] suit where the amount of no individual petitioner's cause of action exceeds fifty thousand dollars exclusive of interest and costs."
[20] We recognize that the term "cause of action" found in La. C.C.P. article 1732, prohibiting a jury trial in a suit if no individual petitioner's cause of action exceeds $50,000, is not synonymous with the term "amount in controversy." The term "cause of action" refers to the claim against the defendant before the court at the time the right to a jury trial is litigated, not the amount of the plaintiff's overall claim arising out of the transaction or occurrence. Benoit v. Allstate Ins. Co., 00-0424, pp. 7-8 (La.11/28/00), 773 So.2d 702, 707. In Benoit, this Court did not overrule Bullock, but merely disagreed with language that was not determinative of the outcome in that matter. 00-0424, p. 9 n. 6, 773 So.2d at 707 n. 6.
[21] La. C.C.P. art. 5 provides:

"When a plaintiff reduces his claim on a single cause of action to bring it within the jurisdiction of a court and judgment is rendered thereon, he remits the portion of his claim for which he did not pray for judgment, and is precluded thereafter from demanding it judicially."
[22] La. C.C.P. art. 3 provides, in part:

"A judgment rendered by a court which has no jurisdiction over the subject matter of the action or proceeding is void."
See also La. C.C.P. art. 2002(A)(3), which provides:
"A final judgment shall be annulled if it is rendered . . . [b]y a court which does not have jurisdiction over the subject matter of the suit."
[23] The Court then reduced the award for past medical expenses by the 15% fault allocated to the plaintiff and third-party pharmacist and added that amount to the $400,000 judgment against the PCF. Hall v. Brookshire Brothers, Ltd., 02-2404, p. 15 (La.6/27/03), 848 So.2d 559, 569.
[24] This amount included that portion of the past medical expenses allocated to the PCF.
[25] La. R.S. 40:1299.47(A)(1)(a) provides;

All malpractice claims against health care providers covered by this Part, other than claims validly agreed for submission to a lawfully binding arbitration procedure, shall be reviewed by a medical review panel established as hereinafter provided for in this Section. The filing of a request for review by a medical review panel as provided for in this Section shall not be reportable by any health care provider, the Louisiana Patient's Compensation Fund, or any other entity to the Louisiana State Board of Medical Examiners, to any licensing authority, committee, or board of any other state, or to any credentialing or similar agency, committee, or board of any clinic, hospital, health insurer, or managed care company.